**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **WATTS-HEALY TIBBITTS A JV,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE UNITED STATES,**<br><br>**Defendant.** | **No. 08-261C**<br><br>**(Senior Judge Smith)** |

**DEFENDANT-INTERVENOR IBC/TOA CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**S. Lane Tucker**
**Perkins Coie LLP**
**1029 W. Third Avenue, Suite 300**
**Anchorage, AK 99501-1970**
**(907) 279-8561**

**Counsel to**
**IBC/TOA CORPORATION**

**Of Counsel:**
**Richard W. Oehler**
**Perkins Coie LLP**
**1201 Third Avenue, Suite 4800**
**Seattle, Washington 98101-3099**
**(206) 583-8419**

**Dated: April 15, 2008**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

DEFENDANT-INTERVENOR IBC/TOA CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION .......... 1

I. ISSUES PRESENTED .......... 1

II. STATEMENT OF THE CASE .......... 1

III. ARGUMENT .......... 3

A. Jurisdiction and Standard of Review .......... 3

B. Plaintiff Waived Its Right To Protest The Navy's Interpretation Of DFARS 252.236-7010 Because It Did Not Raise Its Challenge Prior To The Submission Of Proposals .......... 3

C. Plaintiff Has Not Carried Its Burden To Demonstrate That It Is Entitled To Preliminary Injunctive Relief .......... 6

1. Success On The Merits .......... 7

2. Irreparable Injury To Plaintiff .......... 10

3. Injury To The Government And Other Parties .......... 10

4. The Injunction Is Against The Public Interest .......... 11

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Black Construction Corporation*, B-250647, 93-1 CPD 113 .................................................. 9

*Blue & Gold Fleet, L.P. v. United States and Hornblower Yachts, Inc.*, 492 F.3d 1308 (Fed. Cir. 2007) .................................................................................................. 4, 5, 10

*CACI, Inc. – Fed. v. United States*, 719 F.2d 1567 (Fed. Cir. 1983) ....................................... 6

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ......................................................................................... 8, 9

*Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951 (Fed. Cir. 1990)............................................................................................................................ 6

*FMC Corp. v. United States*, 3 F.3d 424 (Fed. Cir. 1993) ....................................................... 6

*North Carolina Div. of Services for Blind v. United States*, 53 Fed. Cl. 147 (Ct. Fed. Cl. 2002)................................................................................................................... 4, 5

*PGBA, LLC v. United States*, 389 F.3d 1219 (Fed. Cir. 2004) ................................................ 6

*United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)........ 8, 9

**Statutes**

28 U.S.C. Sec. 1491(b)............................................................................................................ 6

**Other Authorities**

DFARS 236.273 ......................................................................................................................... 2

DFARS 252.236-7010..........................................................................................................passim

P.L. 105-45, Section 112 ............................................................................................................ 7

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| WATTS-HEALY TIBBITTS A JV,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 08-261C<br><br>(Senior Judge Smith) |

**DEFENDANT-INTERVENOR IBC/TOA CORPORATION'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff moved for a temporary restraining order, preliminary injunction, permanent injunction and declaratory injunction on April 10, 2008. Defendant-Intervenor opposes plaintiff's motion.

## I. ISSUES PRESENTED

Defendant-Intervenor IBC/TOA Corporation ("IBC/TOA") disagrees with plaintiff's characterization of the issue in this case. The issue before the Court is whether plaintiff has waived its right to protest after award because it was on notice regarding the Navy's interpretation of DFARS 252.236-7010 prior to the submission of offers. If the Court finds that plaintiff has not waived its right to protest, the issue is whether plaintiff has met its burden to obtain preliminary injunctive relief.

## II. STATEMENT OF THE CASE[1]

This matter concerns a request by plaintiff, an unsuccessful offeror, to enjoin performance and rescind the Navy's award of a contract to IBC/TOA made pursuant to solicitation number N62742-07-R01314 for the "FY08 MCON P-502 Kilo Wharf Extension at the Commander Naval Region Marianas, Main Base, Guam." The "American Preference

[1] Because the government's memorandum contains a recitation of the pertinent appropriations acts, regulations, and legislative and regulatory histories, we will not repeat all of that information here.

Policy", as it is commonly referred to, applied to this procurement. As stated at page seven of plaintiff's memorandum, this policy was embodied in DFARS 236.273 pursuant to authority derived from appropriations act P.L. 104-45, Section 112. Since neither the various appropriations acts nor the implementing DFARS clause defined "U.S. firm" or "foreign firm", DFARS 252.236-7010 was issued after notice and comment. The solicitation contained this clause, which defines "U.S. firm" as:

> (a) Definition: "United States firm," as used in this provision, means a firm incorporated in the United States that complies with the following:
>
> (1) The corporate headquarters are in the United States;
>
> (2) The firm has filed corporate and employment tax returns in the United States for a minimum of two years (if required), has filed State and Federal income tax returns (if required) for 2 years, and has paid any taxes due as a result of these filings; and
>
> (3) The firm employs United States citizens in key management positions.

*See* Exhibit 1 (notice no. 3, question number 8) to Defendant-Intervenor's Opposition. As the Navy noted in its Pre-Proposal Answer to question number 8, "foreign entity" is not defined.[2]

Subsequently, the Navy issued "Notice No. 6, Pre-Proposal Questions & Answers", which contained the following question and answer:

> **QUESTION # 22**: Can a U.S. firm, (fully qualified under DFARS 252.236-7010 as a U.S. firm) form a Joint Venture (JV) or partnership with a non-U.S. firm and bid as a prime in the name of the partnership or JV and not be subject to the 20% bid penalty imposed on non-U.S. firms?"
>
> **ANSWER**: Formation of a JV or partnership with a non-U.S. firm is not automatically disqualifying for purposes of the 20% preference. However, the JV or partnership must meet the requirements of DFARS 252.236-7010.

Exhibit 2 to Defendant-Intervenor's Opposition.

[2] The solicitation for this project was issued on October 5, 2007. The Navy issued two relevant documents captioned "Pre-Proposal Questions & Answers" that addressed the issue raised by plaintiff. The first was dated October 11, 2007 (Notice No. 3, *see* questions 7-12); the second was dated October 25, 2007 (Notice No. 6, *see* questions 20-22).

The awardee is a joint venture comprised of International Bridge Corporation ("IBC") and TOA Corporation ("TOA"). IBC is incorporated under the laws of Ohio, while TOA is incorporated in Japan. IBC holds the majority interest in the IBC/TOA joint venture. According to plaintiff-protester's filings it is a joint venture comprised of Watts Constructors LLC which was organized according to the laws of Iowa, and Healy-Tibbitts Builders, Inc., which is incorporated in New Jersey. As joint ventures, neither plaintiff nor defendant-intervenor is "incorporated"; instead they are legally considered to be partnerships.

## III. ARGUMENT

### A. Jurisdiction and Standard of Review

IBC/TOA agrees with the Government's statement of jurisdiction and the standard of review to be applied to this case.

### B. Plaintiff Waived Its Right To Protest The Navy's Interpretation Of DFARS 252.236-7010 Because It Did Not Raise Its Challenge Prior To The Submission Of Proposals

In its Complaint at paragraphs 12-14, plaintiff quotes Pre-Proposal Question and Answer number 22 in notice number 6 (discussed above). In paragraph 15 of its complaint, plaintiff states that although "the answers provided were informational and did not alter the terms of the RFP, the Answer to Question #22 was *incorrect as a matter of law* and conflicted with DFARS 252.236-7010" (Emphasis added). In its memorandum, plaintiff states that "an award to TOA Corporation alone, *or as a joint venture member*, requires the application of the twenty percent preference to protect the interests of competing American firms." *See* Plaintiff's Memorandum at page 11 (Emphasis added). Hence, the plaintiff concludes that "the TOA Corporation, *and hence the IBC/TOA Corporation joint venture*, did not meet" the requirements of DFARS 252.236-0710 (Emphasis added). In short, plaintiff clearly asserts that DFARS 252.236-0710 *automatically* subjects any joint venture that includes a non-U.S. firm to the 20 percent penalty.

Because plaintiff was on notice that the Navy *did not* consider the regulation to require an automatic 20 percent penalty on joint ventures that included a non-U.S. firm, plaintiff was required to protest the Navy's interpretation of this solicitation provision prior to the submission of offers. *Blue & Gold Fleet, L.P. v. United States and Hornblower Yachts, Inc.*, 492 F.3d 1308 (Fed. Cir. 2007). The decision to apply this solicitation provision in this manner was made "during the solicitation, not evaluation, phase of the bidding process." *Blue & Gold*, 492 F.3d at 1313. Offerors were notified of that decision. As stated in *North Carolina Div. of Services for Blind v. United States*, 53 Fed. Cl. 147, 164 (Ct. Fed. Cl. 2002), which was cited favorably in *Blue & Gold*:

> . . . the court in this case holds that where an offeror recognizes a significant deficiency or problem in a solicitation (*e.g., the erroneous application of a particular statute/regulation to the solicitation*) the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding to challenge the procurement, but rather to raise the objection in a timely fashion, *i.e.*, prior to the closing date for the receipt of proposals . . . .

(Emphasis added). Because plaintiff waited to see the outcome of the procurement before voicing any objection to the Navy's allegedly erroneous interpretation and application of the regulation to the solicitation, it is barred from protesting this award by the waiver rule enunciated in *Blue & Gold*.

Plaintiff attempts to circumvent the waiver rule by asserting that the published Pre-Proposal Questions & Answers "did not become part of the solicitation . . . since an amendment incorporating the answer was not issued." Plaintiff's Memorandum at 12.[3] Plaintiff's attempt at circumvention should not be countenanced, as it would clearly undermine the policy considerations and reasoning underlying the Federal Circuit's decision in *Blue & Gold*. As the Federal Circuit stated:

---

[3] Plaintiff does not cite any requirement that an agency must incorporate its regulatory clause interpretations into a solicitation.

> It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm.

*Blue & Gold*, 492 F.3d at 1314.

When an offeror is on notice prior to the submission of its offer that the agency interprets a solicitation provision in a manner that the offeror believes is contrary to law and potentially prejudicial to it, the offeror is required to protest the "erroneous application of the regulation" prior to the submission of offers. *Blue & Gold*; *N.C. Div. of Servs. for the Blind*. To hold otherwise would render the pre-proposal question and answer period meaningless. Furthermore, it would be highly prejudicial to offerors, including the awardee, that relied upon the Navy's answers in forming bidding entities.

At the initial telephonic conference with the Court in this matter plaintiff attempted to circumvent the waiver rule by asserting that it could not possibly have known this would be the outcome because it did not know whether any entities with non-U.S. firms would submit offers. First, this is exactly what *Blue & Gold* and this Court have long sought to prevent – offerors waiting to see what happens before raising their objections. Second, plaintiff's assertion defies credibility. No less than nine questions regarding the U.S./foreign firm issue *vis a vis* the 20 percent penalty were asked by potential offerors and answered by the Navy in notice numbers three and six. The questions asked made it amply clear that U.S. firms were interested in forming alliances with non-U.S. firms in order to bid on this procurement. Based upon the Navy's answers it was patently clear that the Navy would allow offerors to form entities between U.S. and non-U.S. firms without being subject to a 20 percent penalty. Offerors were entitled to, and did, rely upon those answers in forming their firms for this procurement. It would be grossly unfair to allow plaintiff to sit back, knowing that offerors would rely upon the Navy's answers in forming firms with non-U.S. members, and then later

protest if an award were made to one of the firms formed in reliance upon the Navy's interpretation of the solicitation provision. As made clear by the string of cases cited in *Blue & Gold*, this type of manipulation of the procurement process has long been disfavored by this Court.

Because plaintiff was aware of the manner in which the Navy intended to apply the solicitation provision at issue prior to the submission of offers, it was required to submit any protest to that application prior to the due date for submission of offers. Because it did not, it waived its right to raise this same objection after award in an action pursuant to 28 U.S.C. Sec. 1491(b). Hence, plaintiff's protest should be dismissed.

### C. Plaintiff Has Not Carried Its Burden To Demonstrate That It Is Entitled To Preliminary Injunctive Relief

The Federal Circuit has described injunctive relief as "extraordinary relief." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *see CACI, Inc. – Fed. v. United States*, 719 F.2d 1567, 1581 (Fed. Cir. 1983). In order to obtain an injunction, plaintiff must demonstrate by a preponderance of the evidence that: (1) it will succeed on the merits; (2) it will suffer irreparable harm if injunctive relief is not granted; (3) the harm to the plaintiff if an injunction is not granted outweighs the harm to the government and intervenor if an injunction is granted; and (4) the injunction is not against the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004). "No one factor, taken individually, is necessarily dispositive," *FMC Corp.*, 3 F.3d at 427; "the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned to other factors, to justify the denial." *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990).

**1. Success On The Merits**

In order to demonstrate success on the merits, plaintiff must prove that the Navy acted without rational basis or in violation of an applicable procurement regulation when it awarded the contract to IBC/TOA. This plaintiff cannot prove.

Plaintiff can only succeed on the merits by demonstrating that the Navy misapplied DFARS 252.236-7010. Plaintiff asserts that "where a statute's language is unambiguous, its plain meaning is conclusive, and judicial inquiry halts at this point" (Plaintiff's Memorandum at 13, citations omitted); and that the plain meaning of the statute "undoubtedly explains the dearth of caselaw dealing with DFARS 252.236-7010" (plaintiff's memorandum at 10).[4]

First, the "statute" at issue in this case is an appropriations act (P.L. 105-45, Section 112) that refers to "foreign contractor" and "United States contractor" but does not define either of those terms. The DFARS clause implementing this language (236.273) refers to "United States firm" and "foreign firm" but again does not define those terms. DFARS 252.236-7010 defined "U.S. firm", and this is the regulation at issue in this case.

Plaintiff asserts that the meaning of DFARS 252.236-7010 is clear by the plain language and common meaning of the words contained therein, and urges this Court to enforce that regulation according to its obvious terms. Plaintiff's Memorandum at 8. Plaintiff asserts that the "plain meaning" of the regulation is that a "United States firm" is one which is incorporated in the United States, and that "the joint venture that submitted the [winning] proposal was not incorporated and therefore did not meet the requirement of being 'incorporated in the United States'". Plaintiff's Memorandum at 9.

[4] Conversely, one could just as easily assume that the dearth of caselaw challenging the application of this DFARS provision suggests that plaintiff views this regulation differently than the hundreds of other bidders who have been subject to it. On information and belief the government has awarded scores of contracts to U.S. and foreign firms that have formed alliances to bid on projects in the subject geographic area and has not applied a 20 percent penalty to the bid prices. *See* Declaration of Robert W. Toelkes, Exhibit 3. At the initial telephonic conference in this case plaintiff's counsel asserted that "just because they've done it wrong all these years doesn't make it right now." Of course, the government's longstanding practice is evidence that it has consistently interpreted its regulation consistent with its interpretation in this case, not that the plaintiff is right and everyone else is wrong.

Despite its "plain meaning" assertion that IBC/TOA did not meet the requirement of being "incorporated in the United States" because the joint venture itself was not incorporated, in the very next paragraph plaintiff conversely states "there is no statute or regulation that the plaintiff is aware of that would require a joint venture to be an incorporated entity in and of itself," and in the following paragraph asserts "plaintiff is also not suggesting that two or more companies who form a joint venture for the purpose of performing a federal government contract must form an incorporated joint venture, but plaintiff does contend that all of the members of a joint venture must be United States corporations for the purposes of DFARS 252.236-7010." *Id.*

Plaintiff's contention that "all of the members of a joint venture must be United States corporations for the purposes of DFARS 252.236-7010" is obviously not supported by the plain language of the regulation. The regulation is absolutely silent regarding joint ventures, which are generally considered to be partnerships under applicable law. Furthermore, plaintiff has submitted no proof that its joint venture is an incorporated entity in and of itself, which may explain plaintiff's contradictory application (and its amplification) of the regulation. What is clear from plaintiff's analysis is that the regulation alone does not contain enough information to permit a meaningful application without the agency's interpretation of the regulation to guide the Court.

*Chevron* deference is afforded to an agency's interpretation of a particular statutory provision "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (Chevron )). Evidence of such authority may be shown by an agency's power to engage in notice-and-

comment rulemaking or formal adjudication. *See id.* at 230, 121 S.Ct. 2164. *See also Chevron*, 467 U.S. at 843-44, 104 S.Ct. 2778. An agency interpretation meriting *Chevron* deference is reviewed under the Administrative Procedure Act standard, 5 U.S.C. § 706, requiring an agency's findings to be upheld unless the interpretation is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *See also Mead*, 533 U.S. at 227, 121 S.Ct. 2164. For agency "interpretations [similar to those] contained in policy statements, agency manuals, and enforcement guidelines," however, the Supreme Court has stated that courts may treat the agency's guidance as persuasive evidence. *Mead*, 533 U.S. at 234-35, 121 S.Ct. 2164.

The agency's interpretation of the regulation allows joint ventures, which are not "incorporated" entities, to submit offers in these procurements. This is not arbitrary, capricious, or an abuse of discretion. Looking to the remaining factors in the regulation, IBC, which has the majority interest in the joint venture, meets all of the other criteria in the regulation. It is incorporated in Ohio, its principal office is in the U.S. territory of Guam, it has filed all the requisite returns and paid the taxes due in the U.S. territory and in Ohio, and all of its officers, shareholders, and key management personnel are U.S. citizens. Furthermore, the joint venture's principal offices are in the U.S. territory of Guam, and two of its key management personnel are U.S. citizens. Hence, the Navy's determination that IBC/TOA qualified as a U.S. firm has a rational basis and is not arbitrary, capricious, or an abuse of discretion.

Plaintiff's only authority for the proposition that all members of a joint venture must be incorporated in the United States is contained in language quoted in the GAO protest of *Black Construction Corporation*, B-250647, 93-1 CPD 113. The language in the *Black* solicitation defining "U.S. firm" was the same as that contained in the later enacted DFARS provision at issue, except that it contained the language "or if a joint venture, all members of

a joint venture."[5] When DOD enacted DFARS it omitted the "joint venture" language, thereby deleting the previous requirement that all members of a joint venture be U.S. Firms. Defendant-intervenor also notes that GAO addressed the issue of key management personnel and found that having two U.S. citizens and two non-U.S. citizens as key management personnel was acceptable under the American Preference Policy.

The essence of plaintiff's argument is that IBC/TOA is a non-U.S. firm because the minority interest holder is a foreign company. Plaintiff's assertion necessarily results in the exclusion of all foreign firms from participating as joint venture partners with American firms. Neither the underlying appropriations act nor the language of the regulation at issue supports such a restrictive application. The agency's interpretation and application of the regulation is entitled to deference. Furthermore, plaintiff's interpretation hinders, rather than increases, opportunities for American construction firms in the region by preventing them from forming strategic alliances with foreign companies in order to maintain and enhance their business. This clearly contravenes Congress's intent.

**2. Irreparable Injury To Plaintiff**

The only irreparable injury alleged by plaintiff is lost profits. However, Plaintiff has submitted no evidence that it would realize profit if it were to be awarded this contract. Even if plaintiff were to make such a showing, it undoubtedly has a limited capacity for work and the ability to bid on other jobs to fill its capacity, thereby otherwise realizing whatever profits it might have gained from this contract.

**3. Injury To The Government And Other Parties**

We have quoted extensively above from the Federal Circuit's decision in *Blue & Gold* regarding the damage done to the procurement process, to other bidders, and to the government when an unsuccessful offeror waits silently to see the outcome of a procurement

---

[5] A joint venture arrangement was not at issue in that case.

before it asserts its known objections to the procurement process. The time and money expended on a procurement such as this is significant, as is costly litigation after the fact. The potential injury of lost profits for plaintiff is no more irreparable than the potential lost profits to IBC/TOA. Furthermore, IBC/TOA has expended significant resources in preparing for and mobilizing to perform this contract, and has bypassed other bidding opportunities after being awarded this contract. Any delay engendered by an injunction of contract performance would result in significant expense and likely result in a late completion, thereby further injuring the government and IBC/TOA. A recission of the contract award would leave IBC/TOA without this work and without the ability to replace this work within the next six to eight months, thereby significantly damaging an American construction firm. *See* Declaration of Robert W. Toelkes, Exhibit 3. Any financial harm to plaintiff is displaced by the harm to IBC/TOA and the Navy because of plaintiff's failure to timely submit its protest and its utter failure on the merits.

**4. The Injunction Is Against The Public Interest**

On information and belief, it is IBC/TOA's understanding that this wharf extension is required to fulfill the military duties of the United States, and that any delay in this project will impede the fulfillment of those duties. Furthermore, it is not in the public interest to have the procurement process manipulated in this manner by plaintiff, nor is it in the public interest to prevent American construction firms from forming alliances with foreign firms in order to compete for government projects.

Dated: April 15, 2008

Respectfully submitted,

s/ S. Lane Tucker by s/Emily C.C. Poulin
S. Lane Tucker
Perkins Coie LLP
1029 W. Third Avenue, Suite 300
Anchorage, AK 99501-1970
(907) 279-8561

Counsel to
IBC/TOA CORPORATION JOINT VENTURE

Of Counsel:
Richard W. Oehler
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101-3099
(206) 583-8419

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that, on April 15, 2008, I caused a copy of the foregoing Defendant-Intervenor IBC/TOA Corporation's Opposition To Plaintiff's Motion For Temporary Restraining Order And Preliminary Injunction to be filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Emily C.C. Poulin
Emily C.C. Poulin

# EXHIBIT 1

DEPARTMENT OF THE NAVY
NAVAL FACILITIES ENGINEERING COMMAND, PACIFIC
258 MAKALAPA DR., STE. 100
PEARL HARBOR, HAWAII 96860-3134

October 11, 2007

**NOTICE NO. 3**

**PRE-PROPOSAL QUESTIONS & ANSWERS**

**N62742-07-R-1314**
**FY08 MCON P-502, KILO WHARF EXTENSION,**
**COMNAVMARIANAS, MAIN BASE, GUAM**

NOTE: The following questions and answers are provided for INFORMATION ONLY. The RFP remains unchanged unless it is amended in writing on Standard Form 30.

**QUESTION# 1:** In ESOL, when selecting "Register as Plan Holder for Solicitation", the Preference Program (or Size Standard) for this solicitation is Unrestricted. What is the Preference Program?

ANSWER: The Preference Program is for setting aside procurements specifically for small business concerns, such as 8(a), small disadvantaged business, HubZone business, etc. To find out more about Preference Programs, please visit the U.S. Small Business Administration's website at http://www.sba.gov/.

**QUESTION# 2:** In ESOL, regarding the size standard when entering company data, we are not a U.S. firm, so which one should we choose? It is automatically defaulted to 8(a).

ANSWER: Your company size depends on the number of employees or revenues. For this solicitation, you will be considered a large business if you have had average annual receipts of revenue for the past 3 years of $31 million (U.S.) for NAICS Code 237990 - Other Heavy and Civil Engineering Construction.

For more information about the North American Industry Classification System (NAICS), which is by the U.S. Census Bureau, please go to their website at: http://www.census.gov/epcd/www/naics.html.

The 8(a) type of firm is a certified, small disadvantaged business with the U.S. Small Business Administration. Also see http://www.sba.gov/ for more information about the 8(a) program.

**QUESTION# 3:** Is the RFP itself available from the ESOL website by downloading also, like Notice documents?

ANSWER: The RFP, notices and amendments will be available at the ESOL website. However, drawings and specifications will not be posted on the website for downloading. The complete RFP (with the drawings and specifications) is available by request on CD-ROM.

**QUESTION# 4:** In regards to the site visit to the Kilo Wharf on October 19, 2007, for employees that do not have a SSN, alien registration number or a working visa number, is it ok to use a passport number instead?

ANSWER: Foreign nationals that would like to attend the site visit must provide: 1) copy of passport, preferably in color (that is clear and legible, showing passport number, address, birthplace, etc.) and 2) date of birth. A background check is required for foreign nationals, therefore, site visit access may not be guaranteed.

**QUESTION# 5:** Are digital cameras or video cameras allowed during the site visit?

ANSWER: No recording devices will be allowed during the site visit.

**QUESTION# 6:** Is a copy of the geotechnical report for this project available?

ANSWER: A geotechnical report for the project is available and will be provided electronically upon request. The Government shall not be responsible for any interpretation of or conclusion drawn from the data or in formation by the Contractor. See FAR 52.236-4, Physical Data at Document 00100.

**QUESTION# 7:** We understand that a foreign entity bidder would be penalized 20%.

ANSWER: Under the recurring statutory provision and DFARS 236.273(a) and 252.236-7010, foreign firms can propose but cannot be awarded a contract unless the lowest responsive and responsible offer of a United States firm exceeds the lowest responsive and responsible offer of a foreign firm by more than 20 percent.

**QUESTION# 8:** What is official definition of foreign entity?

ANSWER: "Foreign entity" is not defined. The only definition is for "U.S. firm." U.S. firm is defined in DFARS clause 252.236-7010 as:

(a) Definition. "United States firm," as used in this provision, means a firm incorporated in the United States that complies with the following:

(1) The corporate headquarters are in the United States;

(2) The firm has filed corporate and employment tax returns in the United States for a minimum of 2 years (if required), has filed State and Federal income tax returns (if required) for 2 years, and has paid any taxes due as a result of these filings; and

(3) The firm employs United States citizens in key management positions.

**QUESTION# 9:** Does [deleted] have to own 51% share of the LLC?

ANSWER: "LLCs" (Limited Liability Companies) are the creation of state and territorial laws of the United States. An LLC is equivalent to a corporation for the purposes of applying DFARS 252.236-7010.

**QUESTION# 10:** Would you clarify how this would apply to a LLC partnership?

ANSWER: As a general proposition, LLCs do not issue shares and members may or may not have control rights in proportion to their contribution. The law does not express an ownership percentage.

**QUESTION# 11:** What happens if there are two Japanese firms and [deleted] in the LLC? What would be [deleted] percentage to avoid foreign entity application?

ANSWER: See above answers.

**QUESTION# 12:** What happens if there are two Japanese firms, [deleted] and another U.S. firm in the LLC? What would be [deleted] percentage to avoid foreign entity application?

ANSWER: See above answers.

**QUESTION# 13:** We have downloaded the front end documents and wonder when the remaining Bid documents, specifications and drawings will be posted on to the e-sol web site.

ANSWER: See Question #3 answer above.

End of Notice

# EXHIBIT 2

DEPARTMENT OF THE NAVY
NAVAL FACILITIES ENGINEERING COMMAND, PACIFIC
258 MAKALAPA DR., STE. 100
PEARL HARBOR, HAWAII 96860-3134

October 25, 2007

**NOTICE NO. 6**

**PRE-PROPOSAL QUESTIONS & ANSWERS**

**N62742-07-R-1314**
**FY08 MCON P-502, KILO WHARF EXTENSION,**
**COMNAVMARIANAS, MAIN BASE, GUAM**

NOTE: The following questions and answers are provided for INFORMATION ONLY. The RFP remains unchanged unless it is amended in writing on Standard Form 30.

**QUESTION# 20:** Does the term "U.S. firm" in DFARS 252.236-7010 include a corporation or LLC organized under the laws of Guam? American Samoa?

ANSWER: Yes. The term as derived from the statute has been interpreted to include the outlying areas of the United States such as Guam and American Samoa.

**QUESTION# 21:** Assume an LLC meets all requirements of DFARS 252.236-7010, but as a newly formed LLC has not filed any tax returns, nor paid any taxes, because neither are required yet for the newly formed LLC. Would that newly formed LLC meet the requirements DFARS 252.236-7010?

ANSWER: A newly-formed LLC would likely not have been previously required to file and pay taxes, and therefore is in compliance with 252.236-7010(a)(2).

**QUESTION# 22:** Can a U.S. firm (fully qualified under DFARS 252.236-7010 as a U.S. firm) form a Joint Venture (JV) or partnership with a non-U.S. firm and bid as a prime in the name of the partnership or JV and not be subject to the 20% bid penalty imposed on non-U.S. firms?

ANSWER: Formation of a JV or partnership with a non-U.S. firm is not automatically disqualifying for purposes of the 20% preference. However, the JV or partnership must meet the requirements of DFARS 252.236-7010.

**QUESTION# 23:** Can a prime and subcontractor have a teaming arrangement whereby decisions are made by a committee comprised in equal parts by the prime and subcontractor?

ANSWER: The government recognizes the offeror (i.e. the offeror as stated on the SF1442) as the party legally liable to the government and responsible for performance of the contract. The Contractor's management plan will be reviewed and evaluated for the overall ability of the offeror to manage the project including management of subcontractors, and authority of the offeror's key personnel. See RFP Factor C. The offeror's key personnel shall be employees of the offeror's firm. See Factor B of the RFP, Document 00202 at p.5. If the firm is claimed to be a "United States firm" for purposes of 252.236-7010, then the firm must employ United States citizens in key management positions.

**QUESTION# 24:** Is there any restriction (other than 80% subcontract limit) on a U.S. prime subcontracting work to a non-U.S. firm subcontractor?

ANSWER: DFARS 252.236-7010 provides no restrictions on the amount of work performed by a non-U.S. (foreign) subcontractor. However, see RFP Factor D for evaluation of Small Business utilization.

**QUESTION# 25:** Response was provided on Notice No. 4.

**QUESTION# 26:** QC Manager Qualification, Reference: Section 01 45 00.00 20, page 4, 1.5.1.2. Does it have to be a U.S. accredited college or university?

ANSWER: No.

**QUESTION# 27:** Document 00 01 15, page 8, Reference Drawings. Is it possible to request copies of the following reference drawings: P-451, P-625 and P-626. Also, could we obtain subsurface data?

ANSWER: Response deferred. To be answered in a subsequent Notice.

**QUESTION# 28:** Under Section 01 57 19.00 20, 3.1.3, it states that the Contracting Officer will obtain the "U.S. Army Corps of Engineers permits for work with U.S. Water (Section 10, Rivers and Harbors Act) and for dredging (Section 401 and 404(b)1, Clean Water Act). Please provide copies of the U.S. Army Corps of Engineers permits and the Section 401 and 404(b)1 water quality certification permits including any appropriate application documents that will describe the permit requirements.

ANSWER: Copies of permit and water quality certification will be provided upon completion.

**QUESTION# 29:** Please provide anticipated date of issuance of the U.S. Army Corps of Engineers permit and 401 Water Quality Certification. This date is critical to scheduling the project since in-water work shall not commence until receipt of the U.S. Army Corps of Engineers permit and 401 Water Quality Certification.

ANSWER: Response deferred. To be answered in a subsequent Notice.

**QUESTION# 30:** Section 01 57 19.00 20, 3.1.3, par. b describes various environmental documents. Please provide copies of all such documents such as: "Environmental Impact Statement with a Record of Decision or Environmental Assessment with a finding of no significant input."

ANSWER: Copies of the Environmental Impact Statement (EIS) with the Record of Decision will be provided upon completion. The Final EIS is available for public review at the following public libraries in Guam:

- Nieves M. Flores Memorial Library, 254 Martyr Street, Hagatna, Guam 96910
- Robert F. Kennedy Memorial Library, University of Guam, 303 University Drive, Mangilao, Guam 96923

Copies of the Final EIS available by special request by contacting Alice Mende, Contract Specialist at Alice.Mende@navy.mil.

**QUESTION# 31:** Under Section 01 57 19.00 20, 3.2.2, it states that the Contractor shall submit a Storm Water Notice of Intent (for NPDES coverage) and a Storm Water Pollution Prevention Plan (SWPPP) and gain approval prior to the commencement of work. This specification section also states that the SWPPP and Notice of Intent (NOI) shall be submitted via the Contracting Officer a minimum of 30 calendar days prior to start of any land disturbing. How much time should the Contractor allow for the NOI and SWPPP approval process after the NOI and SWPPP are submitted to the Contracting Officer? Is 30 calendar days a realistic duration?

ANSWER: Response deferred. To be answered in a subsequent Notice.

**QUESTION# 32:** Does the Contractor need the NOI and SWPPP approval prior to commencing in-water work? Or can in-water work commence upon the Contracting Officer obtaining the U.S. Army Corps of Engineers permit and 401 Water Quality Certification?

ANSWER: No, the Contractor does not need the NOI and SWPPP approval prior to commencing in-water work. Yes, in-water work can commence upon the Contracting Officer obtaining the U.S. Army Corps of Engineers permit and 401 Water Quality Certification.

**QUESTION# 33:** Specification Section 01 14 00, paragraph 1.3 e. (4) states: “Contractor’s vessel passing through the ESQD Arc will not be allowed when ordnance operations are being conducted at Alpha and Bravo Wharf. Please provide number of days and/or hours per month that Contractor should allow for interruptions due to ordnance handling operations at Alpha and Bravo Wharf. Would the interruptions be for a full 24-hour day or just during certain hours of the day?

ANSWER: Response deferred. To be answered in a subsequent Notice.

**QUESTION# 34:** Will foreign built dredges and/or barges and vessels be allowed to dredge and transport dredged materials on this project? In other words, is this solicitation subject to the Act of May 28, 1906, commonly known as “the Foreign Dredge Act” (codified at 46 U.S.C. App. 292) and the Merchant Marine Act of 1920 (codified at 46 U.S.C. App. 883)? These Acts require that foreign-built dredges shall not engage in dredging in the United States and that merchandise, including the dredged material under this contract, must be transported by vessels built in and documented under the laws of the United States and owned by persons who are citizens of the United States.

ANSWER: All laws applicable to the work conducted under the subject RFP shall be followed. Work conducted in Guam is considered work in the United States.

**QUESTION# 35:** Will the length of the steel pipe driving shoe be included or excluded from measurement for payment of Precast Piles Bid Item 0001B?

ANSWER: Pile length measurement for payment does not include the pipe driving shoe.

**QUESTION# 36:** Will you be posting the Site Visit Attendees?

ANSWER: Yes, see Notice No. 5.

End of Notice

# EXHIBIT 3

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **WATTS-HEALY TIBBITTS A JV,** | |
| **Plaintiff,** | **No. 08-261C** |
| **v.** | **(Senior Judge Smith)** |
| **THE UNITED STATES,** | |
| **Defendant.** | |

**DECLARATION OF ROBET W. TOELKES**

I, Robert W. Toelkes, under penalty of perjury, do hereby affirm and swear the following is true and correct to the best of my knowledge and belief:

1. I am the Executive Vice-President of International Bridge Corporation ("IBC"). IBC/TOA Corporation Joint Venture ("IBC/TOA") is a joint venture formed to bid and build the Kilo Wharf Extension Project.

2. IBC/TOA's principal offices are in the U.S. Territory of Guam. My father, William E. Toelkes, and I are key management personnel of the joint venture. We are U.S. citizens. IBC/TOA has obtained an Employer Identification Number from the United States Internal Revenue Service.

3. IBC holds the majority interest in the IBC/TOA JV.

4. IBC is fully qualified as a United States firm under DFARS 252.236.7010. IBC is incorporated in the State of Ohio, with its headquarters located in the U.S. Territory of Guam. IBC has filed corporate and employment tax returns in the United States for more than two years, has filed state and federal income tax returns for more than two years, and has paid all taxes due as a result of those filings. All IBC corporate shareholders, officers, and management employees are U.S. citizens.

5. IBC's joint venture partner, TOA Corporation, is a Japanese corporation.

6. IBC has more than 40 years of experience as an American construction firm in Guam. We have been awarded several contracts as partners in a joint venture with a foreign firm, and have never had a 20 percent penalty applied against our bid. I am aware that numerous contracts over the years have been awarded to joint ventures such as ours and am not aware of DFARS 252.236-7010 being applied in the manner asserted as proper by plaintiff.

7. Watts Constructors LLC, a partner in plaintiff's joint venture, is an experienced construction contractor in the Pacific and should be aware that DFARS 252.236-7010 is not interpreted and applied in the manner suggested in its current protest.

8. In forming this joint venture to bid and perform the Kilo Wharf Extension project, IBC/TOA was entitled to, and did, rely upon the Navy's questions and answers regarding the 20 percent price penalty for non-U.S. firms. Our reliance was reasonable and was consistent with our procurement experience in the Pacific and our knowledge of contract awards in the Persian Gulf.

9. Since being awarded this contract, IBC has bypassed bidding opportunities on other significant jobs in order to devote our resources to this project. We are currently bidding only on small projects. A suspension of contract work, or a rescission of the contract awarded, would result in significant and irreparable harm to IBC because we cannot replace this work in the next six to eight months.

10. Since being awarded this contract, IBC/TOA has expended significant resources preparing for and mobilizing to perform this contract work. We have engineers and schedulers preparing submittals and schedules; we convened a major kick-off meeting in Dallas, Texas last week, are conducting a pre-construction meeting on April 17, 2008 in Guam with personnel flown in from various worldwide locations; are mobilizing equipment in our yard; plan to mobilize to the site on April 21, 2008; and are gearing up for our

partnering meeting on May 1, 2008.

11. The construction schedule in this project is extremely tight. The Navy, through Amendment No. 9, has already reduced the time for completion by 40 days from Notice to Proceed to completion. Any delay in performance of this project will likely result in a delay in the completion of the project.

Dated: April 15, 20008

Robert W. Toelkes
Executive Vice President
International Bridge Corporation