**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **WATTS-HEALY TIBBITS A JV,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08-261C** |
| **v.** | ) | **(Senior Judge Smith)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# DEFENDANT'S OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

TODD M. HUGHES
Deputy Director

OF COUNSEL:
ROBERT E. LITTLE
Department of the Navy
Washington, D.C.

STEPHEN C. TOSINI
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 616-5196
Fax. (202) 514-7969

Attorneys for Defendant

May 20, 2008

# TABLE OF CONTENTS

ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Background On The Solicitation And Award. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. *WHT I* And WHT's Second Motion For Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I. Standard of Review For Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II. Standard For Procurement Challenges.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. WHT Still Cannot Demonstrate A likelihood Of Success Upon The Merits. . . . . . . . . . . . 9

A. The Responsibility Determination Complied With The Applicable Regulation. . . 9

1. WHT Identifies No Error By The Contracting Officer. . . . . . . . . . . . . . . . 10

2. FAR 52.209-5 Addresses Only United States Proceedings. . . . . . . . . . . . 13

B. The Navy Permissibly Construed DFARS 252.236-7010 T Not To Automatically Apply A 20 Percent Premium To Joint Ventures' Bids.. . . . . . . . . . . . . . . . . . . . . 16

1. The Cited DFARS Provisions Evince No Intent That United States Firms Exclude Joint Ventures With Foreign Firms. . . . . . . . . . . . . . . . . . . . . . . . 16

2. WHT's Speculation That IBC Cannot Perform 51 Percent Of The Work On Kilo Wharf Is Irrelevant.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV. WHT Has Failed To Demonstrate Irreparable Harm Absent Injunctive Relief.. . . . . . . . . 18

V. WHT Has Not Demonstrated The Possibility Of Lost Profits Is A Greater Hardship Than The Hardship To The Navy Should Contract Performance Be Delayed. . . . . . . . . . . . . . 20

VI. The Public Interest Counsels Against An Injunction.. . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## TABLE OF AUTHORITIES

### CASES

Baird Corp. v. United States,
1 Cl. Ct. 662 (1983). . . . . . . . 8

Bean Stuyvesant, LLC v. United States,
48 Fed. Cl. 303 (2000). . . . . . . . 9

Bromley Contracting Co. v. United States,
15 Cl. Ct. 100 (1988). . . . . . . . 9

Califano v. Sanders,
430 U.S. 99 (1977).. . . . . . . . 8

Campbell v. United States,
2 Cl. Ct. 247, 249 (1983). . . . . . . . 9

Chapman Law Firm Co. v. United States,
67 Fed. Cl. 188 (2005). . . . . . . . 19

Cincom Systems, Inc. v. United States,
37 Fed. Cl. 266 (1997). . . . . . . . 8, 19

Cincom Systems, Inc. v. United States,
37 Fed. Cl. 663 (1997). . . . . . . . 9

Citizens to Preserve Overton Park, Inc. v. Volpe,
401 U.S. 402 (1971).. . . . . . . . 8, 9

Commerce Com v. Bhd. of Locomotive Eng'rs,
482 U.S. 270 (1987).. . . . . . . . 13

FMC Corporation v. United States,
3 F.3d 424 (Fed. Cir. 1993). . . . . . . . 8

Hayes Intern. Corp. v. United States,
7 Cl. Ct. 681 (Cl. Ct. 1985). . . . . . . . 12

Heckler v. Chaney,
470 U.S. 821 (1985).. . . . . . . . 13

Impresa Construzioni Geom. Domenico Garufi v. United States,
52 Fed. Cl. 421 (2002). . . . . . . . . . 10, 11

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001). . . . . . . . . . passim

Intel Corp. v. ULSI Sys. Tech., Inc.,
995 F.2d 1566 (Fed. Cir. 1993). . . . . . . . . . 7

John C. Grimberg Co., Inc. v. United States,
185 F.3d 1297 (Fed. Cir. 1999). . . . . . . . . . 10, 12

Lermer Germany GmbH v. Lermer Corp.,
94 F.3d 1575 (Fed. Cir. 1996). . . . . . . . . . 8

Magellan Corp. v. United States,
27 Fed. Cl. 446 (1993). . . . . . . . . . 21

Minor Metals, Inc. v. United States,
38 Fed. Cl. 379 (1997). . . . . . . . . . 19

M.W. Kellogg Co. v. United States,
10 Cl. Ct. 17, 23 (1986). . . . . . . . . . 9

National Steel Car, Ltd. v. Canadian Pac. Ry., Ltd.,
357 F.3d 1319 (Fed. Cir. 2004). . . . . . . . . . 7

Ramcor Servs. Group, Inc. v. United States,
185 F.3d 1286 (Fed. Cir. 1999). . . . . . . . . . 8

Ravens Group, Inc. v. United States,
78 Fed. Cl. 390 (Fed. Cl. 2007). . . . . . . . . . 12

Redland Genstar, Inc. v. United States,
39 Fed. Cl. 220 (1997). . . . . . . . . . 9

Shandong Huarong Gen. Group Corp. v. United States,
122 F. Supp. 2d 1367 (Ct. Int'l Trade 2000). . . . . . . . . . 19

Sierra Military Health Servs. v. United States,
58 Fed. Cl. 573 (2003). . . . . . . . . . 19

Spherix, Inc. v. United States,
62 Fed. Cl. 497 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Synetics, Inc. v. United States,
45 Fed. Cl. 1 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

The Cube Corp. v. United States,
46 Fed. Cl. 368 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Thomas Jefferson Univ. v. Shalala,
512 U.S. 504 (1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Pierce Auto Freight Lines, Inc.,
327 U.S. 515 (1946).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Virginia Railway Co. v. Systems Federation No. 40,
300 U.S. 515 (1937).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Watts Healy Tibbits a Joint Venture v. United States,
--- Fed. Cl. ----, 2008 WL 1962421 (May 2, 2008).. . . . . . . . . . . . . . . . . . . . . . . . . passim

Yakus v. United States,
321 U.S. 414 (1940).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Your Home Visiting Nurse Servs., Inc. v. Shalala,
525 U.S. 449 (1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Zenith Radio Corp. v. United States,
710 F.2d 806 (Fed. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## STATUTES

5 U.S.C. § 702. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5 U.S.C. § 706(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1491(a)(3).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 U.S.C. § 1491(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

28 U.S.C. § 1491(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

28 U.S.C. § 1491(b)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**MISCELLANEOUS**

Federal Acquisition Regulation; Contractor Responsibility, Labor Relations Costs, and Costs Relating to Legal and Other Proceedings, 65 Fed. Reg.80,256 (Dec. 20, 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Black's Law Dictionary, 8th Ed. (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| **WATTS-HEALY TIBBITS A JV,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 08-261C** |
| **v.** | ) | **(Senior Judge Smith)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Defendant respectfully submits its opposition to the second motion for a temporary restraining order and preliminary injunction filed by plaintiff Watts-Healy Tibbits, a Joint Venture ("WHT"). WHT's motion should be denied because, as with its first motion, WHT cannot demonstrate that it is likely to succeed upon the merits. Moreover, WHT still cannot demonstrate irreparable harm. Lastly, the harm to the Government and the public interest should current performance of the contract be enjoined would far outweigh any potential harm to WHT.

## ISSUES

1. Whether the contracting officer abused the wide discretion afforded to him by finding the successful bidder to be a responsible bidder, based upon the record before him at the time he made the challenged procurement determination.

2. Whether the Navy's construction of DFARS 252.236-7010, as not automatically imposing a 20 percent premium upon bids made by joint ventures between United States and foreign contractors, is a permissible interpretation of the undefined statutory term "United States contractor," and the regulatory definition of "United States firm."

3. Whether WHT's mere assertion of economic harm due to unspecified possible lost profits is sufficient to demonstrate immediate irreparable harm.

4. Whether harm to the Government due to an injunction would be less than harm to WHT absent injunctive relief, given that timely completion of the Kilo Wharf Extension is necessary for military readiness and national security.

5. Whether an injunction is in the public interest, given that timely completion of the Kilo Wharf Extension is necessary for military readiness and national security.

## STATEMENT OF FACTS

### I. Background On The Solicitation And Award

"The Naval Facilities Engineering Command, Pacific, issued solicitation no. N62742-07-R-1314 on October 5, 2007, requesting proposals to construct the 'FY08 MCON P-502 KILO WHARF EXTENSION AT THE COMMANDER NAVAL REGION MARIANAS, MAIN BASE, GUAM.'" Cmpl. at ¶ 6. The solicitation requested bids for a major extension and improvements at a Navy wharf in Guam. As WHT noted at paragraph seven of its complaint, the synopsis of the solicitation noted that:

> This project will provide for a new 121.92 meter (400FT) extension to the existing Kilo Wharf on the west and perform all necessary dredging within the harbor to enable the construction. The project will also provide for 243.84 meter (800FT) reinforced concrete crane girders and supports at the existing wharf and wharf extension. Upgrade existing wharf to improve its seismic resistance by strengthening the existing caissons. Provide new asphalt concrete pavement and a reinforced concrete deck for the existing Kilo Wharf and wharf extension. Included in the project scope is new primary and secondary electrical power to Kilo Wharf, including new electrical generator and switchgear buildings and upgrading the electrical service and secondary distribution systems at the wharf. The project also includes extending the shore

> utilities infrastructure from the existing wharf to the Kilo Wharf extension for the piping and piping supports for potable freshwater and sewer and fire protection systems; upgrade the lighting, telecommunications systems, lightning protection and grounding systems, and CCTV systems. Construct new access road along the south and west side of the existing wharf to service the new wharf extension and construction mooring island.

The synopsis, issued September 19, 2007, also noted that responses were due by November 19, 2007 and that the "[e]stimated range is from $65,000,000 to $85,000,000." See Gov. Opposition to WHT's First Motion for Injunctive Relief ("Gov. PI I Opp.") at Ex. A.

The solicitation included DFARS 252.236-7010, which defines "United States firm" to mean "a firm incorporated in the United States that complies with the following: (1) The corporate headquarters are in the United States; (2) The firm has filed corporate and employment tax returns in the United States for a minimum of 2 years (if required). . .; and (3) The firm employs United States citizens in key management positions." Likewise, "Offers from firms that do not qualify as United States firms will be evaluated by adding 20 percent to the offer." See Am. Cmpl. at ¶ 10 (quoting DFARS 252.236-7010).

On October 25, 2007, the Navy responded to the question whether a joint venture between a foreign and a United States firm could be considered a "United States firm":

> QUESTION# 22: Can a U.S. firm (fully qualified under DFARS 252.236-7010 as a U.S. firm) form a Joint Venture (JV) or partnership with a non-U.S. firm and bid as a prime in the name of the partnership or JV and not be subject to the 20% bid penalty imposed on non-U.S. firms?
>
> ANSWER: Formation of a JV or partnership with a non-U.S. firm is not automatically disqualifying for purposes of the 20% preference. However, the JV or partnership must meet the requirements of DFARS 252.236-7010.

Gov. PI I Opp. at Ex. C; Am. Cmpl. at ¶ 13. The contracting officer provided notice to WHT on that date as well. Yoshimura Dec. I at ¶ 17.

Bidders provided technical proposals to the Navy by November 19, 2007, and price proposals by December 5, 2007. Am. Cmpl. at ¶ 17. The Navy then held discussions with bidders beginning December 19, 2007, and by March 6, 2008, the bidders had furnished proposal revisions. Id. at ¶ 18.

At the time of the relevant procurement, TOA Corp. had on file with the United States a certification, pursuant to FAR 52.209-5, entitled "Certification Regarding Debarment, Suspension, Proposed Debarment, and Other Responsibility Matters (Dec 2001)." Id. at ¶ 40; WHT Mot at Ex. E (copy of certification).

In his second declaration, the contracting officer explained the steps that he and his staff undertook in conducting the responsibility investigation and analysis of IBC/TOA's bid:

- Verify SF 1442, Solicitation, Offer and Award, for authorized signatures
- Verify acknowledgment of Amendments 0001- 0010 to the RFP
- Verify bid acceptance period of 120 days
- Very bid bond for signatures, amount, and approved surety (at Treasury Circular at http://fms.treas.gov/)
- Verify price:
  - Determine price is within a reasonable range
  - Confirm pricing with IBC/TOA
  - Verify mathematical extension of unit prices
- Verify business registration, articles of incorporation, etc.
- Verify contractor's ability to perform work under guidelines established by the Japanese Ministry of Construction in conjunction with Japanese Constitutional prohibitions, relating to World War II (facilities for weapons)

- Verify contractor and key personnel for any debarment on EPLS at http://www.epls.gov/
- Verify satisfactory record of performance (CCASS, etc.)
- Review Dun & Bradstreet
- Verify tax compliance with Guam Department of Taxation
- Verify registration in CCR at http://www.ccr.gov/
- Verify legal name agreement between SFJ442, SF30, CCR, ORCA, bonds, joint venture agreement, etc.
- Verify Representations & Certifications:
  - Verify RFP Document 00600, Representation and Certifications for Contracting by Negotiation
  - Verify Online Representations and Certifications Application (ORCA) at http://orca.bpn.gov/
- Review financial capabilities:
  - Review financial statements
  - Review financial ratios on company's cashflow, liquidity, ability to pay its current obligations, etc.
  - Review line of credit
  - Review existing commitments of current projects
- Review joint venture agreement and address particular issues with regard to the joint venture agreement
- Conduct search on an internet search engine of the offeror.

Yoshimura Dec. II at ¶ 8.

More than five months after explaining to all bidders that "[f]ormation of a JV or partnership with a non-U.S. firm is not automatically disqualifying for purposes of the 20% preference," the Navy awarded Contract No. N62742-07-C-1314 to IBC/TOA Corp. ("IBC/TOA") for $83,838,018. Gov. PI I Opp. at Attachment D (award notice). WHT's post-award bid protest followed.

International Bridge Corporation ("IBC") is an Ohio corporation that is operationally based in Guam and has performed construction work for the Navy on previous military construction projects. TOA Corporation is a Japanese corporation that specializes in marine construction and dredging and has performed work on Federal Government contracts. The awarded price was $83,838,018, with an option for installation of physical security equipment. The price included all work in the RFP without the necessity for deductive bid items that would have reduced the scope of work. The first increment, $40,000,000, was awarded and the balance will be awarded in fiscal year ("FY") 2009. Yoshimura Dec. I at 4.

The declaration of Rear Admiral Joseph P. Mulloy, filed under seal in conjunction with our response to WHT's first motion, explains why timely completion of Kilo Wharf is necessary for military operations in the Pacific Theater and why delays would harm military readiness and national security. To meet the strict readiness deadline for completion of Kilo Wharf, IBC/TOA has begun performance.

## II. ***WHT I*** **And WHT's Second Motion For Injunctive Relief**

The Court denied WHT's first motion for injunctive relief, concluding that the Navy had permissibly construed the DFARS 252.236-7010 definition of "United States firm" to include joint ventures between United States and foreign corporations. Watts Healy Tibbits a Joint Venture v. United States, --- Fed. Cl. ----, 2008 WL 1962421 (May 2, 2008) ("WHT I"). The Court analyzed the Navy's construction of the underlying statutory and DFARS provisions, pursuant to the standard that an agency's interpretation of its own regulations must be sustained unless "'plainly erroneous or inconsistent with the regulation.'" Id. at *4 (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)). Applying this analysis, the Court

concluded that there was a "rational basis" for the Navy's construction of the regulation and award of the contract to IBC/TOA in this case. Id. at *5. The Court further concluded that "the balance of the hardship weighs against Plaintiff in this case as this post-award bid protest was filed on the eve of contract performance in a large and complex construction project. In addition, [the Court held that] the public interest requires the completion of the project on time." Id.

After WHT filed its amended complaint and second motion, the Court held a telephonic status conference on May 6, 2008. There, the Court summarily denied WHT's request for reconsideration of WHT I and directed the Government and defendant-intervenor to respond to two new arguments raised in WHT's amended complaint and second motion: (1) whether the contracting officer abused his discretion making his responsibility determination, where the contracting officer did not know of certain administrative penalties and accusations leveled at TOA in Japan, and the additional non-record documents proffered by WHT do not establish any material misrepresentation on TOA's certification; and (2) whether the contracting officer was required, as a matter of law, to treat IBC/TOA as a foreign bidder pursuant to DFARS 252.236-7010, because of speculation contained in WHT's moving papers that IBC/TOA is a "sham" joint venture. See, e.g., WHT Mot. at 11.

## ARGUMENT

### I. Standard of Review For Injunctive Relief

"A preliminary injunction is a 'drastic and extraordinary remedy that is not to be routinely granted.'" National Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1324 (Fed. Cir. 2004) (quoting Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993)). Because the grant of an injunction is "extraordinary relief," the Court applies "exacting

standards." Lermer Germany GmbH v. Lermer Corp., 94 F.3d 1575, 1577 (Fed. Cir. 1996). To obtain this extraordinary relief, the movant must establish that (1) it ts likely to succeed upon the merits; (2) it will suffer immediate irreparable harm if preliminary relief is not granted; (3) the balance of the hardships tips in its favor; and (4) a preliminary injunction is in the public interest. FMC Corporation v. United States, 3 F.3d 424, 427 (Fed. Cir. 1993). Absence of any prong of this test results in denial of injunctive relief. Id.

The party seeking injunctive relief bears the extremely heavy burden of demonstrating that it is "entitled to injunctive relief by clear and convincing evidence." Cincom Systems, Inc. v. United States, 37 Fed. Cl. 266, 268 (1997) (citing Baird Corp. v. United States, 1 Cl. Ct. 662, 664 (1983)). A party faces an even greater burden when it seeks injunctive relief that, if granted, would interfere with governmental operations. Yakus v. United States, 321 U.S. 414, 440 (1940); Virginia Railway Co. v. Systems Federation No. 40, 300 U.S. 515, 552 (1937).

## II. Standard For Procurement Challenges

The standard of review in a bid protest is whether the agency action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 28 U.S.C. § 1491(b)(1), (4); 5 U.S.C. § 702, 706(2)(A); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001); see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977); Ramcor Servs. Group, Inc. v. United States, 185 F.3d 1286, 1290 (Fed. Cir. 1999); The Cube Corp. v. United States, 46 Fed. Cl. 368, 374 (2000); Synetics, Inc. v. United States, 45 Fed. Cl. 1, 5 (1999).

Procurement decisions are entitled to a "presumption of regularity," Citizens to Preserve Overton Park, 401 U.S. at 415 (citations omitted). Likewise, Court does not substitute its judgment for that of the agency. WHT I, 2008 WL 1962421at *3 (citing Citizens to Preserve Overton Park, 401 U.S. at 415); see also Redland Genstar, Inc. v. United States, 39 Fed. Cl. 220 (1997); Cincom Systems, Inc. v. United States, 37 Fed. Cl. 663, 672 (1997). "'[D]eference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations.'" Id. at *4 (quoting M.W. Kellogg Co. v. United States, 10 Cl. Ct. 17, 23 (1986)). "'This deference is particularly great when a negotiated procurement is involved and is greater still when the procurement is a best value procurement'" as is the case here. Id. (quoting Bean Stuyvesant, LLC v. United States, 48 Fed. Cl. 303, 320 (2000)). Thus, the disappointed bidder "bears a heavy burden," and the procurement officer is "entitled to exercise discretion upon a broad range of issues confronting" him. Impresa, 238 F.3d at 1332 (citations and quotes omitted). This burden "is not met by reliance on [the] pleadings alone, or by conclusory allegations and generalities." Bromley Contracting Co. v. United States, 15 Cl. Ct. 100, 105 (1988); see also Campbell v. United States, 2 Cl. Ct. 247, 249 (1983).

## III. WHT Still Cannot Demonstrate A likelihood Of Success Upon The Merits

### A. The Responsibility Determination Complied With The Applicable Regulation

WHT has failed to establish that the contracting officer abused his discretion in determining IBC/TOA to be a responsible bidder and awarding it the contract. WHT has not presented any requisite record evidence necessary to meet its "heavy burden" to rebut the presumption of regularity given to a contracting officer's responsibility determination.

### 1. WHT Identifies No Error By The Contracting Officer

WHT bases its allegation only upon non-record information concerning foreign administrative proceedings about which the contracting officer was unaware. See Yoshimura Dec. II at ¶¶ 2-7 (explaining that he first became aware of new claims after award of the Kilo Wharf contract based upon assertions made by a WHT principal).

The appellate court has held that contracting officers have broad discretion in making responsibility determinations:

> Although FAR 9.105-1(a) does require the contracting officer to have, or to obtain, enough information to make a responsibility determination, the contracting officer is the arbiter of what, and how much, information he needs. Because responsibility decisions are largely a matter of judgment, contracting officers are generally given wide discretion to make this decision. . . . Thus although the contracting officer is given the discretion to seek additional or clarifying responsibility information from a contractor, he is not obligated to do so.

John C. Grimberg Co., Inc. v. United States, 185 F.3d 1297, 1303 (Fed. Cir. 1999) (citations omitted); see also Impresa, 238 F.3d at 1334-35 ("Contracting officers are 'generally given wide discretion' in making responsibility determinations and in determining the amount of information that is required to make a responsibility determination.") (internal citations omitted).

WHT relies primarily upon the Court's decision upon remand in Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 421, 427 (2002), in which the Court concluded that the contracting officer in that case had "failed to conduct an independent and informed responsibility determination," with respect to the awardee's integrity and business ethics. In that regard, the court noted that "[t]he standard of reasonableness to be applied when evaluating a contracting officer's decision is not subjective, but objective." Id. at 428. The

Court thus considered the following objective evidence in making its determination: that the contracting officer "was aware of an ongoing investigation . . . as well as pending proceedings and the appointment of legal representative to handle JVC's contract administration," and that he "made assumptions about the terms of the receivership agreement, but he did not himself read it nor did he obtain assistance in reading it." Id. at 427-28. Based upon that significant evidence, the Court held that the responsibility determination lacked a rational basis. Id. at 428.

The examination of the contracting officer in Impresa was at the instruction of the appellate court to examine the awardee's business ethics and integrity, where the contracting officer had actual knowledge of specific issues at the time of award. See Impresa, 238 F.3d at 1340-41. In that case, before Impresa was placed in receivership by an Italian court, Impresa's principal "had engaged in bid rigging and was involved in a Mafia organization in connection with previous contracts." Id. at 1328. In directing an examination, the court explained that it was a "most unusual case" and that ordinarily the agency need not be required to provide an explanation of its responsibility determination unless the presumption of regularity "has been rebutted by record evidence suggesting the agency decision was arbitrary and capricious." Id. at 1338 (emphasis supplied); see also id. at 1341 (holding that an inquiry into the rationality of a decision "should not be ordered unless record evidence raises serious questions as to the rationality of the contracting officer's responsibility determination") (emphasis supplied). The court further noted that a litigant challenging the presumption of regularity afforded a contracting officer's responsibility determination "bears a heavy burden." Id. at 1338.

Given that contracting officer in Impresa knew of the circumstances surrounding the awardee before award of the contract, but there was no record of any further investigation, the

appellate court found "one of those rare cases in which an explanation [of the contracting officer's responsibility determination] is required," id. (emphasis supplied), to create a record.

However, WHT has failed to present any "record evidence" to rebut the presumption of regularity. Instead, WHT relies upon non-record information about which the contracting officer was unaware. In this case, given IBC/TOA's representations, the contracting officer clearly believed that he had enough information to make a responsibility determination and was under no obligation to obtain additional information. See John C. Grimberg, 185 F.3d at 1303; Yoshimura Dec. II at ¶ 7 (noting that he first learned of Japanese proceedings involving TOA after contract award). Because WHT has presented no record evidence to rebut the presumption of regularity given to contract officer responsibility determinations, WHT has not met its "heavy burden." Stated another way, "an affirmative finding of . . . responsibility [under FAR] 9.105-2(b) . . . is 'not readily susceptible to reasoned judicial review' and 'affirmative determinations of responsibility generally will not be overturned absent allegations of fraud or bad faith.'" Ravens Group, Inc. v. United States, 78 Fed. Cl. 390, 401-402 (Fed. Cl. 2007) (quoting Hayes Intern. Corp. v. United States, 7 Cl. Ct. 681, 687 (Cl. Ct. 1985), to sustain responsibility determination from challenge alleging failure to investigate unethical behavior).

Indeed, rather than alleging that the contracting officer erred at the time of award, WHT accuses IBC/TOA of wrongdoing before the Court for the first time, and essentially asks the Court to direct the Navy to reopen the solicitation proceeding based upon new evidence. However, "an agency's refusal to reopen a closed case is generally committed to agency discretion by law and therefore exempt from judicial review." Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 455 (1999). Further, to the extent that WHT seeks to compel

debarment of TOA based upon new evidence, any "decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Heckler v. Chaney, 470 U.S. 821, 831 (1985). When an agency "refuses to reopen a proceeding, what is reviewable is merely the lawfulness of the refusal." Commerce Com v. Bhd. of Locomotive Eng'rs, 482 U.S. 270, 278 (1987). "[O]verturning the refusal to reopen requires 'a showing of the clearest abuse of discretion.'" Id. (quoting United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 534-35 (1946)). Review is available only in cases "alleging new evidence or changed circumstances that rendered the agency's original order inappropriate." Id. (internal quotations omitted). In this case, as demonstrated below, there is no new evidence or changed circumstances that warrant compelling the Navy to reopen the solicitation and, once reopened, to essentially debar TOA from competing for Government contracts as a matter of law.

**2. FAR 52.209-5 Addresses Only United States Proceedings**

WHT proffers newspaper articles and uncertified documents purported to be translations of Japanese administrative penalty dispositions for bid rigging. WHT Br. at Exs. A-D. These materials do not demonstrate any misrepresentation because the certification process, promulgated through notice and comment rulemaking, is limited to United States proceedings.

In 2000, "[t]he Federal Acquisition Regulatory Council ('FAR Council') . . . issu[ed] a final rule clarifying what constitutes a 'satisfactory record of integrity and business ethics' in making contractor responsibility determinations under FAR Part 9." Federal Acquisition Regulation; Contractor Responsibility, Labor Relations Costs, and Costs Relating to Legal and Other Proceedings, 65 Fed. Reg. 80,256 (Dec. 20, 2000). There, the FAR Council conducted notice and comment rulemaking upon the scope of the certification required to be filed pursuant

to FAR 52.209-5, concluding that certifications would require only disclosure of certain proceedings before tribunals in the United States:

> The final certification that has been added to Part 52, however, is not as broad as the standard in FAR 9.104. The certification is an implementation measure, designed to provide the contracting officer with the information that the FAR Council anticipates will be most useful in making the responsibility determination (e.g., felony convictions and indictments), while at the same time avoiding the imposition of undue reporting burdens on prospective contractors. In response to comments, the final certification has been broadened to include violations of State felony law as well as Federal law. In both cases, the certification focuses on cases that have been brought by governmental authorities. The final certification, however, has not been broadened to include adverse judgments in civil cases brought by private parties or to include violations of foreign law. In addition, in response to comments, the certification in the final rule has been clarified to exclude administrative "complaints" (as opposed to adjudicated administrative actions); . . . The fact that administrative complaints, private civil cases, and violations of foreign law have been not included in the final certification, however, does not mean that they cannot be taken into the contracting officer's consideration in making the responsibility determination; to the extent that the contracting officer becomes aware of such cases, and they constitute "relevant credible information," the contracting officer must consider them in making the responsibility determination. Rather, the relatively narrow focus of the certification (as opposed to the general standard) reflects the FAR Council's attempt to craft a certification that is clear and that does not impose an undue reporting burden on prospective contractors.

Id. at 80,060-61 (emphasis supplied). Accordingly, TOA's certification, WHT Br. at Ex. E, contains no material omission with respect to claims of Japanese bid rigging because the certification addresses only United States proceedings.

That is not to say, however, that the Government is unconcerned with bid rigging. Assuming the accuracy of the non-record documents proffered by WHT, the Government fully

expects IBC/TOA to "affirmatively to supply additional information (e.g., 'explain the nature of the violation and whether any fines, penalties, or damages were assessed')." 65 Fed. Reg. at 80,061. Indeed, IBC/TOA must continue to affirmatively demonstrate that it is ethically responsible pursuant to the requirements of FAR 52.203-13 ("CONTRACTOR CODE OF BUSINESS ETHICS AND CONDUCT (DEC 2007)"), which is incorporated in the Kilo Wharf contract. See WHT Br. at 7 (FAR 3.1004) (concerning code of business ethics and conduct). Accordingly, IBC/TOA must provide to the United States "a written code of business ethics and conduct, . . ., [a]n ongoing business ethics and business conduct awareness program; and . . . [a]n internal control system." FAR 52-202-13(b)-(c).

Furthermore, that TOA was one of a large number of companies that were targeted for enforcement action by Japanese administrative authorities is not necessarily dispositive with respect to contracts in the United States, where contractors are subject to different laws and standards. Although this information is of great concern, it does not dispositively mandate a finding of non-responsibility, as WHT maintains. Had questions surfaced as to TOA's conduct during the solicitation process, the contracting officer could have investigated and assessed the probability of similar or related conduct under this contract. Whether or not such an inquiry would have resulted in a non-responsibility finding is purely speculative. WHT Br. at 9. Rather, under the wide discretion afforded to him, the contracting officer weighs numerous factors to make his prediction, including, whether the contractor has been rehabilitated; whether any individuals involved in previous unethical behavior will be involved in performance of the contract; whether the contractor has procedures in place to prevent similar behavior; and any

other factor that the contracting officer deems relevant.[1]

### B. The Navy Permissibly Construed DFARS 252.236-7010 Not To Automatically Apply A 20 Percent Premium To Joint Ventures' Bids

The Navy permissibly interprets DFARS 252.236-7010 as not imposing, as a matter of course, a 20 percent premium upon the bids of joint ventures between United States and foreign contractors. WHT I, 2008 WL 1962421 at *4-5 (citations omitted).

WHT raises two new arguments. First, WHT attempts to raise a new legal argument previously available to it based upon different DFARS provisions that addressed different contracting circumstances. Second, WHT maintains -- without citing to any evidence -- that the successful bidder was a "sham" joint venture, arguing that IBC essentially rented out its United States corporate status to TOA. Neither argument merits revisiting the Court's decision.

#### 1. The Cited DFARS Provisions Evince No Intent That United States Firms Exclude Joint Ventures With Foreign Firms

WHT attempts to find support from two DFARS provisions that evince no intent that joint ventures between United States and foreign firms automatically be subject to the 20 percent premium contained in DFARS 252.236-7010. See WHT Br. at 25 (citing DFARS 252.236-7011 ("Overseas Architect-Engineer Services – Restriction to United States Firms"); DFARS

---

[1] WHT's argument concerning IBC's corporate status is also unfounded. See Yoshimura Dec. II at ¶¶ 10-13 (describing circumstances concerning IBC's paperwork at the Office of the Ohio Secretary of State, explaining that IBC was, in fact a corporation at the time or award, and providing confirming documentation). Moreover, Watts, Constructors LLC ("Watts"), was not a corporation at any time relevant to this action, despite WHT's representations. See Am. Cmpl. at ¶ 3. Rather, under Iowa law, "'Limited liability company' or 'domestic limited liability company' means an unincorporated association having one or more members, and organized under or subject to this chapter." 1 I.C.A. § 490A.102(13) (emphasis supplied). See also id. at § 490A.102(5) ("'Corporation' means a domestic corporation formed under the law of this state or subject to the law of this state, or a foreign corporation as defined in this chapter.").

252.236-7012 ("Military construction on Kwajalein Atoll – evaluation preference")). Both provisions involve special situations not relevant here. The two provisions also do not, by their own terms, evince intent that the definition of United States firm be limited as WHT asserts.

DFARS 252.236 7011 addresses only a narrow subset of contracts. It applies to architectural/engineering ("AE") contracts that are (1) funded with military construction appropriations; (2) estimated to exceed $500,000; and (3) to be performed in Japan, in any North Atlantic Treaty Organization member country, or in countries bordering the Arabian Gulf. See DFARS 252.236.609(70). The provision restricts award of such AE contracts to United States firms and joint ventures of United States firms and "Host Nation" firms. "Host nation" refers to "[a] nation that receives the forces and/or supplies of allied nations, coalition partners, and/or North Atlantic Treaty Organization organizations to be located on, to operate in, or to transit through its territory." See, e.g., Army Regulation 570-9 at 7. AE contracts, pursuant to the Brooks Act, do not involve evaluation of prices or the application a price preference. FAR 36.601. Indeed, DFARS 252.236 7011 does nothing to constrict the definition of United States firms as found in DFARS 252.236-7010; rather, it simply sanctions "Host Nation" firms as eligible participants for overseas AE contracts performed within a Host Nation. Moreover, under WHT's reading of DFARS 252.236 7011, all joint ventures must be excluded from the definition of United States firm except those involving Host Nations because the 20 percent premium would apply unless a bidder is a "United States firm or a joint venture of United States and host nation firms." DFARS 252.236 7011(c).

DFARS 252.236-7012 also addresses a limited subset of construction contracts, preventing contracting officers from imposing the 20 percent bid premium on proposals from

United States and Marshallese firms but imposing no requirements upon contracting officers with respect to joint ventures. Therefore, this provision also says nothing about the situation in this case and, if read in conjunction with DFARS 252.236-7011 under WHT's reasoning, would irrationally impose the 20 percent premium upon all bids from joint ventures.

### 2. WHT's Speculation That IBC Cannot Perform 51 Percent Of The Work On Kilo Wharf Is Irrelevant

WHT also speculates, without any support, that "it was arbitrary, capricious, and an abuse of discretion for the Contracting Officer to accept the representation that IBC was a responsible and viable joint venture partner of TOA, much less a controlling 51% partner." WHT Br. at 11. There is no basis for this assumption -- or for any relevance to the 51 - 49 agreement. Indeed, WHT knows full well that the prime contractor -- in this case the IBC/TOA joint venture -- was required to perform only 20 percent of the total amount of work upon the contract. Yoshimura Dec. II at ¶ 15, id. at Ex. 4 (solicitation dated October 7, 2007, mandating that "[t]he Contractor shall perform on the site and with its own organization at least twenty percent (20%) of the contract amount."). Further, the 51-49 percent ownership of the joint venture is not a function of the size of the companies; it is a function of the joint venture agreement. WHT Br. at 10.

Lastly, speculation concerning IBC's and/or TOA's ability to finance the Kilo Wharf project and to obtain bonding is simply irrelevant. Id. at 10-11. Rather, joint venture means "[a] business undertaking by two or more persons engaged in a single defined project. • The necessary elements are: (1) an express or implied agreement; (2) a common purpose that the group intends to carry out; (3) shared profits and losses; and (4) each member's equal voice in controlling the project." Black's Law Dictionary 8th Ed. (2004). There is no capital requirement. Indeed,

reason dictates that joint venturers should merge complimentary strengths, and thus, the fact that one member of a venture contributes more capital than other members is of no moment.

## IV. WHT Has Failed To Demonstrate Irreparable Harm Absent Injunctive Relief

WFT alleges only that it may be deprived of profits upon this contract if does not ultimately obtain the Kilo Wharf contract. Lost profits alleged in a self-serving declaration absent any supporting documentation are insufficient to establish this prong for injunctive relief.

First, the harm claimed is entirely economic. However, "economic loss alone does not constitute irreparable harm." Chapman Law Firm Co. v. United States, 67 Fed. Cl. 188, 193 (2005). In another recent case, plaintiff submitted sworn declaration that "allege[d] economic harm in that the loss of the . . . contracts will 'significantly harm' its business, including the necessity of dismissing many of its employees." Spherix, Inc. v. United States, 62 Fed. Cl. 497 (2004). The Court rejected that claim, reasoning that "economic loss without more does not rise to the level of irreparable injury." Id. (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983). Likewise, in Sierra Military Health Servs. v. United States, 58 Fed. Cl. 573, 582 (2003), "most of plaintiff's alleged harms result not from a lack of opportunity to compete for the contract, but from loss of the actual contract." In sum, "economic harm without more, does not seem to rise to the level of irreparable injury." Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997) (citing Zenith, 710 F.2d at 810).

Second, WTF provides no evidence concerning injury that it may sustain. WHT filed only a late declaration asserting economic harm absent any concrete evidence of its magnitude. Watts-Heltzel Dec. This speculation is not "clear and convincing evidence." Cincom Systems, 37 Fed. Cl. at 268 (citation omitted); see also Shandong Huarong Gen. Group Corp. v. United

States, 122 F. Supp. 2d 1367, 1370-71 (Ct. Int'l Trade 2000) (noting that "affidavits submitted by interested parties are weak evidence, unlikely to justify a preliminary injunction" and further rejecting injunctive relief because plaintiff had "not bolstered these affidavits through independent evidence indicating exactly how and when these lost sales would force it out of business."). Moreover, this declaration erroneously assumes that WHT would be awarded the contract were the Court to remand to the Navy to either apply a 20 percent premium to IBC/TOA's bid or to revisit the contracting officer's responsibility determination (should the contracting officer ultimately find IBC/TOA non-responsible on remand). However, there is no evidence indicating that WHT's offer was acceptable with respect to cost. See, e.g., Gov. PI I Opp. at Ex. A (noting that "[e]stimated range is from $65,000,000 to $85,000,000"); WHT I, 2008 WL 1962421 at *2 (noting that "IBC/TOA submitted a bid in the amount of $83,838,018 as compared to Plaintiff's proposed price of $95,146,204.").

## V. WHT Has Not Demonstrated The Possibility Of Lost Profits Is A Greater Hardship Than The Hardship To The Navy Should Contract Performance Be Delayed

As demonstrated above, WHT asserts only, and absent evidentiary support, that it may lose (unspecified) profits upon the Kilo Wharf contract absent injunctive relief. In contrast, the Kilo Wharf must be completed by March 31, 2010, for the reasons discussed in the declaration of Admiral Mulloy. The harm to the United States would be acute should an injunction prevent completion of the wharf by this deadline. Indeed, nothing has changed since the Court held that "the balance of the hardship weighs against Plaintiff in this case as this post-award bid protest was filed on the eve of contract performance in a large and complex construction project. In addition, the public interest requires the completion of the project on time," WHT I, 2008 WL

1962421 at *5, except the deadline for completion of Kilo Wharf is more than one month closer than it was when the Court held oral argument upon WHT's first motion.

Congress recognized the harm caused by certain delays in contracting, mandating that, "[i]n exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3). Given the urgent need for completion of Kilo Wharf, harm to "the interests of national defense and national security" are paramount.

Moreover, the declarations of the two presidents of the plaintiff joint venture asserts only that WHT could perform the contract in a timely manner if the contract were awarded by April 26, 2008. Watts-Heltzel Dec. at ¶ 14. Given the contours of this case, such an award could never have been made. Regardless, that date has long passed, and the successful bidder has already begun performance upon this time-sensitive project.

**VI. The Public Interest Counsels Against An Injunction**

As discussed above, and as the Court explained in WHT I, 2008 WL 1962421 at *5, the public interest will be served by protecting national security. WHT merely repeats its arguments already rejected by the Court in WHT I. However, the importance to national security of the timely completion of this project is even more acute as more than one month has passed from WHT's first motion, and the deadline for completion is that much closer.

> If we were dealing with a procurement for toilet seats or belt buckles, then delaying for three weeks a procurement that will evolve over three years would be *de minimus*. In this case, however, we are dealing with hardware that, according to General Garner, can give our armed forces a critical advantage in combat. In assessing the need for injunctions, the court must give due regard to the interests of national security. 28 U.S.C. § 1491(a)(3).

Magellan Corp. v. United States, 27 Fed. Cl. 446, 448 (1993).

As previously explained, this case involves a contract for building necessary infrastructure for our national defense. Furthermore, all parties were placed on notice that it was imperative that this major project be completed by March 31, 2010. Nevertheless, WHT allowed five months to pass before springing its objections to the solicitation upon the Government.

Therefore, WHT has not demonstrated, through clear and convincing evidence, that it is in the public interest to grant its motion for a preliminary injunction.

**CONCLUSION**

For these reasons, we respectfully request that the Court deny WHT's second motion for injunctive relief.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director
/s/ Todd M. Hughes
TODD M. HUGHES
Deputy Director
/s/ Stephen C. Tosini
STEPHEN C. TOSINI
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 616-5196
Fax. (202) 514-7969
Attorneys for Defendant

OF COUNSEL:
ROBERT E. LITTLE
Department of the Navy
Washington, D.C.

May 20, 2008

**CERTIFICATE OF FILING**

I hereby certify that on this 20th day of May 2008, a copy of the foregoing "DEFENDANT'S OPPOSITION TO PLAINTIFF'S SECOND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION" was filed electronically. I understand that notice of this filing will be sent to all parties by electronic mail and operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Stephen C. Tosini